Mr. Clerk, will you call the next case, please? 3-13-0312, People of the State of Illinois, Appaloohee, by Gary DeNinovich, v. Jamar and v. House of Hammond, by Charles Shire. Mr. Shire? Please begin. May it please the Court. My name is Charles Shire, and I represent the appellant, Jamar House. We're asking that his conviction in Peoria County for attempted murder and possession of a weapon by a felon be reversed and remanded to Peoria County for a retrial. Our three main arguments are, one, that there was insufficient evidence to prove the defendant guilty. Two, there was ineffective assistance at counsel. And three, that there were these ex parte communications with the trial judge. And I know that Your Honors have all read the facts, but very briefly, this is a shooting outside of a nightclub after midnight, and the police show up. The appellant, the defendant in that case, was not present. There was no firearm found. There were three people present, and that was Gates, the individual who was alleged to have shot, a guy named Parnell, and a guy named Binion. Not one of those three individuals told any law enforcement that they heard shots, saw shots, or were shot. And in fact, what they were doing was trying to leave the scene. There were two cars that had holes in them, gunshot holes, essentially. A BMW and a Honda. Those three individuals I was just referencing were trying to leave in a BMW. There was testimony at the trial that police, one, spoke with those three individuals at the scene, but they also looked at those two automobiles. And what they didn't testify about was any blood in that automobile. Now, the reason that we raise that, and the reason we think that that is so important is Gates is the individual outside the club who it is alleged that the appellant shot. Yet, while meeting with police, never complains about being shot, and the police never observe any torn clothing or blood. But what the police do see is Gates driving that BMW. And what the police do is they get inside that BMW, and they're looking for evidence, and they take photographs, but they don't see any blood. And there's absolutely no evidence presented at the trial that Gates was intoxicated, that he was acting intoxicated. And the reason we point that out is, well, I mean, the argument would be, well, maybe he didn't know he was shot. He didn't feel it. But there was no evidence of intoxication. Now, Gates is allowed to leave the scene, and there's time that he's unaccounted for. Not an hour, up to two hours. So there's a gap. We don't know exactly when, but it's between an hour and two hours. We don't know where he goes. Now, he testifies at trial that he goes home, but it's not corroborated by anything. Where this case picks up, then, the same officer who was at the scene goes to the hospital. And the state put into evidence a picture, which your honors have seen in the record of trial. It is relatively gruesome of a shoulder injury. So it was clear that he did suffer a wound, and there was blood, yet no torn clothing, no bloody clothing, no blood on the car. We can't account for him for this hour, hour and a half. Now, there is one witness, Parnell, one of the three who's outside the club. He says that it was the Apollo. So he's the only person at the trial to say that. Now, basically, the entire trial is about Parnell, and that's what gets to our ineffective assistance, and I'll get to that in a minute. But at the scene, Parnell never says one word about hearing shots, seeing shots, or that his buddy Gates has been shot. One week later, when Detective Moore goes to Parnell's house, only then does Parnell, in our view, in our estimation, change his story. But he doesn't do it right away. In fact, Detective Moore goes into his house, and again, he denies it. In fact, he actually concocts a lie. Parnell tells Detective Moore, not only was I not there, I was at a different club, on a different block. I wasn't even there. The detective says, without showing him a video, but says, hey, no, no, we have a video of you, and this is all testified to in the trial. And then he changes his story, and then he's shown a photo lineup, and purportedly selects the appellant. If you look at the two charges that he's convicted, well, originally, he's charged with three things. Possession of a weapon by a felon, agbat, and attempted murder. Obviously, the agbat sort of goes away as he's convicted of the attempted murder. But the possession of weapon by a felon, at most, at most, if we believe Parnell, and he sees that the appellant with a gun, and there was testimony that the appellant had a felony, you've got that, at most. But that's an eight-year sentence. He was given 33 years on the attempted murder. Now, for the attempted murder, he either needs to be shooting with the intent to hurt or kill Gates, or some type of transferred intent theory. Now, transferred intent was never argued at the trial, but let's presume that the shooter was trying to shoot Parnell or Binion, the third person, but instead actually shot Gates. Well, then you could use a theory of transferred intent. But we don't even know that for certain. The only person to even tell us about the direction of the shots is Parnell. And that's why Parnell's credibility is so important. Now, when Parnell did testify about seeing the appellant, he said that there were these words exchanged, completely contradicted by Gates. Gates never testifies to that. He never says that. And he says, well, there are these shots in their direction. Again, Gates doesn't testify to that. He says he doesn't see it. Now, Parnell contradicts Gates even later. Parnell testifies at the trial that Gates told him at the scene that he had been shot. Gates testified at the trial. He didn't say that. He didn't tell Parnell that he had been shot. And that led us into the ineffective assistance of counsel. And those arguments were that there was no questioning of Gates on these communications and no cross-examination of Parnell on visibility. Now, we feel that that's relevant because Parnell seeing the appellant is the entire case. If Parnell doesn't see the appellant or testify about that, you don't have possession of a weapon by a felon. And you certainly don't have the attempt at murder. Now, if Gates is cross-examined about these communications, further inconsistencies between Parnell and Gates could have been developed. But that was never, ever explored. Plus, if they were to cross-examine Parnell on visibility, then you might be able to have even more information on whether or not credibility is an issue. But maybe even more importantly is the direction of the shots. Because if the shots actually were at these three guys' direction, then you might have a transferred intent theory. But if they weren't, you don't have transferred intent. You don't have attempted murder. It could just be reckless discharge of a firearm. But none of that is explored in the trial. And now you have a young man who has a 33-year sentence. And with the Strickland test, you'll find it's got to fall below the standard. Well, if Parnell is the main witness, and he's the guy, without Parnell, the case doesn't exist. Then you have to focus in all your efforts on Parnell's credibility. And so the second prong of Strickland is, well, it has to make a difference. Well, how does it not make a difference? If we don't believe Parnell, it's a not guilty case. Now, there is other evidence in the case, but none of that was all that compelling. A video that doesn't really show much. This suggestion that the clothing that Jamar House had on versus the clothing in the video, none of that is all that conclusive. There's this evidence that there was a .38 caliber jacket found. Yet that's not, there's no scientific evidence. What we said in the brief, there's no scientific evidence in the case. There's nobody to come in and say, on the video, what we see, yeah, that's a .38, that gun would shoot a .38 caliber bullet. None of that. None of that's in there. And so then that leads us to the third point, which is this ex parte communication. So after the finding of guilt, but before post-trial motions, Detective Moore, who is the same detective that goes out, finds Parnell, and in our view, gets Parnell to make this statement, one week before Parnell is to be sentenced on his own case, mind you. But this Detective Moore who goes out and gets this statement from Parnell, goes up to the judge, this was a bench trial in Peoria County, goes up to the judge in a social setting, and thanks the judge for the verdict, and says that this is an important verdict for the Peoria Police Department. Now, People v. Moffitt, which is the case we cited, indicates that the defendant must show that the ex parte communication rose to a level of unfairness. And we didn't put a lot in the brief, and the state sort of pointed that out and argued, well, boy, you can really see how weak this argument is because they don't really have a lot on it. We couldn't find a lot of case law on it. What we do argue is that, at the bare minimum, the appearance of impropriety. What does this suggest? That the judiciary in Peoria County is somehow in concert or trying to assist or do things that are important for the Peoria Police Department? Now, obviously, that's not, one, it's probably not true, but two, it's not the message that you want to communicate to the public. How can that not be impropriety? In fact, it's impropriety per se, I would suggest. Now, also indicated in there is that, as we try to argue that Judge Lyons, who was the state's attorney at the time that the defendant was charged, when he takes over the case, that he can't judge the post-trial motions based entirely on the transcripts. Now, again, there's not case law on it. Couldn't find case law that would support that. However, I contend that certain things, you can't unring some bells. You just can't. And when a police officer who is a material witness in a case tells a judge that this thank you, and this is really important to the Peoria Police Department, any other judge who shows up and gets this transcript, guess what he or she now reads? It's the same comment that Detective Moore has made. Well, how does he or she then not know that this is an important case, an important conviction, so much so that a detective, an experienced detective, thought that it was a wise idea to go thank a judge? Counsel has two minutes. And so that's our argument, that you can't unring that. You can't unring it in a transcript. What Judge Lyons would have had to have been able to do is to see Detective Moore in person to judge his credibility. Otherwise, what you've got is just the basic transcripts and this statement that is so prejudicial in our view, it's so bad, that how did Jamar House believe, or any person in the public viewing this case believe that that was fair? It can't possibly. Does it matter that the judge retired shortly after? Yes and no. I think that it matters to this extent. It's the type of comment that can't be recovered from. It's the type of comment that per se should have given him a new trial. That no new judge, whether he retired or recused himself or whatever, no new judge can come in and take it up from that point because that's a material state witness working for the police department making a type of comment that raises a level of impropriety so high that there's nothing that can be done. That's where our argument is. Thank you for listening. You do have to acknowledge, though, that Judge Lucas did the right thing by disclosing the statement or you wouldn't be here. He absolutely did the right thing. But in our view, he should have done one more thing. And that is? Which is vacate the judgment, vacate the verdict. I'm troubled by the fact that you say Judge Lyons was the prosecutor when this case was filed. That's my memory. Are you certain of that? I'm not 100% certain of that, ma'am, but that's my memory, that he was a prosecutor when this case was filed. Because that's a pretty strong statement. He was the state's attorney, not the prosecutor. I'm sorry. Yeah, yeah. Peoria County State's attorney when this case was filed. Why didn't somebody do a motion to substitute? Well, I don't know. I wasn't trial counsel. Well, why aren't you arguing ineffective assistance of counsel because there wasn't a motion to substitute without clause? I'm not sure at that point it necessarily rises to that level. I don't think that it's just because Judge Lyons once was the state's attorney. I think it's the nature of that comment. Your statement in court here is that Kevin Lyons was the state's attorney when those charges were filed. If so, I think there's some ethical issues that attach to Judge Lyons. That's a very strong statement. I appreciate you saying that, but I may be wrong on that, and that wasn't laid out in our briefs. I don't know that 100%. I don't know the exact date on which Judge Lyons took the bench. Okay, then I will simply caution you that unless you're absolutely certain, those things shouldn't be stated on the record in open court because it does undermine the integrity of the system unless you're absolutely certain of that. Yes, ma'am. All right, thank you very much. And Mr. Knitted? Mr. Knitted? I wish I had a little better memory. I'll be honest with you. I honestly do not know when Mr. Brady took over. I noticed that the events happened. You don't need to address that argument. I don't mean to derail you at all. These are matters of record, and I can look it up after. I just wish I could recall. It seems like it's been at least that long, but time flies when you're having fun. With respect to reasonable doubt, counsel underplays the evidence somewhat in the sense of we have people's exhibits 21 and 22, two DVDs. One is the DVD taken from Richardson, Maine. It shows the incident. It shows an individual walking across the street as Gates, Pinnell, and Bingen are trying to get into the BMW. It shows Pinnell looking at the individual. It looks as though something has been said. The individual then goes off, walks off outside the screen. All of a sudden, you have an individual that comes in, and I am not familiar with Peoria at all, but apparently there must be some sort of subway or some sort of underground walkway or something that this individual is looking down. At first, I thought this was the individual who walked across the street, but it wasn't. It's some other individual. All of a sudden, he walks out of the way, and then in the distance, you see an individual come out in the camera shot holding a gun, pointing in the direction of the three individuals. All of a sudden, you see the three individuals take off. You see the individual with the gun then running. Basically, I couldn't tell you how close to the camera he came, but you obviously can see him. You can see his clothing. You can see what he was wearing, and you can see he still had the gun in his hand. Now, can I tell you it's a .38? I can't tell you it's a .38. I couldn't tell you it's a .357 Magnum. I couldn't tell you anything of what it was, but you can see the individual. Now, the argument to be made that we don't know that the shots were fired in their direction, when we talk about the fact that the video is blurry, is whatever, it's inconclusive, is truly an understatement of the strength of the people's case and of the evidence in general. Because, and where this comes in, is the fact that Pinnell, and we talk about his credibility, and we talk about cross-examining, and we talk about ineffective assistive counsel. The thing is, Pinnell had no idea about this video. The officer who investigated this had already developed the defendant as a suspect in the case. He already had the photo array with him that included the defendant's photograph. At the time he went to Pinnell's residence, not a week later, but four days later, he goes in and he asks Pinnell, hey, what's going on? No, I wasn't there when I was here. Yes, Pinnell did lie to the officer. Nobody said anything at the scene. When they stopped the car, because it was part of the shooting, it was part of the scene, to take and have their evidence person come in and do his thing. When the officer says, hey, look, we got a surveillance video, and I know you were there. Well, at that point, he does, quote-unquote, change the story. He does take and tell, yes, I was there. He then relates events that are clearly unequivocally corroborated by the DVD, a DVD he did not see. He then basically, the officer then says, can you identify who the person was that fired the shots? Yes, I can. He didn't ask him who it was, didn't tell him he knew. At that point, he then presents the photo array. At that point, Pinnell then picks out the photograph of the defendant. From the state's point of view, under the accepted standard for revealing a reasonable doubt argument, we think that based on the totality of the evidence, because of the knitting of these three separate events, the three separate events I'm talking about is the shooting at 120 approximately, the appearance of Gates at the hospital at 309, and the DVD of the DUI stop of the defendant at 330 a.m., because of how this was all knitted together, how it was all presented, how the DVD corroborates the evidence, corroborates the testimony, the fact that there's a lack of blood in the car can be explained. Gates never knew he was shot until he got home. Is that an impossibility? No. We see stories all the time on TV and everything about how people are injured. They don't know that they've even been injured. Sometimes they walk around for weeks with a bullet or something in them that they don't even know they've gotten. So this is not totally incredulous. And all of this is linked together. All of this is presented to the fact finder, which is the trial judge. The arguments that are presented here were exactly the same arguments that were presented to the trial judge. The trial judge, however, rejected those, found the evidence credible, put it all together, and found the defendant guilty. I think what the defendant is asking this court to do, which this court is now permitted to do by rule, by the standard of review, is to actually retry the defendant, is to retry the case in order to take and come up with an acquittal. And I think that under the accepted standard, that is totally inappropriate and is not something that the court ought to do. With respect to the argument concerning ineffective assistance, what the defendant argues here, basically a lot of it goes to the discretion of counsel. The fact that one attorney might do something more or something different than another doesn't make what the other attorney didn't do or did do necessarily ineffective. In this case, counsel has not necessarily shown that the failure to cross-examine Gates about the facts related by Parnell would have so impeached the evidence that there would have been a reasonable doubt of the defendant's guilt. Gates has consistently testified, I don't know who shot me. That's been from day one. So you can take and cross-examine him about everything, about the color of a person's clothing, the type of gun that he had, the direction it was fired. If you want to take a note of the direction it was fired from, all you've got to do is watch the DVD and see which way they ran. Obviously, you're not going to run toward the gunshot, you're going to run away from it, which is exactly what they did. So to a large extent, a lot of the cross-examination... On the video, so it isn't just a drawing of the gun, it makes them run, but it's... It's a shot... You don't hear, but from what you can see, and from the way it looks, as soon as the gun comes up, and as soon as... I'm saying, and I use the word assume, because you can't hear, but from the way things are, all of a sudden, all three take off high-tailing it in the opposite direction, of which the individual that has the gun is coming, is running toward them. He actually comes behind the vehicle. There's cars parked on the street, there's other cars, and he actually comes... It's been a while. If I recollect, he comes... He's either on the sidewalk by a car, or he's actually back in the street behind a car, or somewhere by a car, when it starts to fire. He's really off in the far distance of the tape. I guess you say, if you're looking at it... I'm not sure which way the street runs, north-south, but let's just say it runs north-south, okay? They're going this way, he comes up at the far end, and it's... I don't want to say it's hard to see, but unless you're really watching it, it's almost like it's something that doesn't catch your eye at first, but once you notice it, it really is. You can see the individual come out of nowhere, and just all of a sudden is in the street, or behind a car, somewhere parked in that vicinity, three, four, five cars down, maybe three cars down, four cars down, something like that, and all of a sudden, as soon as he raises, everybody takes off. So my way I put it together is, it looks as though when he begins to fire, they all hightail it in the opposite direction. So I think that the cross-examination isn't going to make any difference, because Pennell's credibility isn't going to be affected because what he testified to, what he told the officer is clearly corroborated by the DVD, by that security tape taken from the camera by Richards on Main. As far as identification is concerned, Pennell testified, I was a few feet away from the individual when he crossed the street. I saw who it was. I've known the guy for nine years. Seems like a fairly credible identification to me, that if he turns and he sees the individual come across and all of a sudden fires a gun and he looks and sees the guy actually raise the gun and fire, he's going to be able to identify him. He's known this guy for nine years. So, again, a motion to suppress the photo array has to have some semblance of success in order to even state a claim for ineffective assistance. There's nothing here to indicate that there would have been any success had he filed a motion to suppress, especially given Pennell's ability to independently identify the individual. So even if the photo array had been suppressed, he still could have testified to what he saw. It wouldn't have made any difference. So much of this ineffective assistance of counsel, at least in my opinion, has really much to do about absolutely nothing. Finally, with respect to the ex parte communication, is it something that probably all wish hadn't been said and done? Definitely. But in this case, to say that this rises to the level of such unfairness that the defendant should be given a new trial, especially since the communication is post-trial, I don't quite ascribe the same interpretation to the comment that counsel has presented here today. It was post-trial, but it wasn't post-sentencing? No, no. Post-trial. It was made while, again, I'm not exactly sure where the trial judge was, but he was waiting in line for lunch when the detective approached him. And this was after the trial, but prior to the post-trial motions slash sentencing hearing that was scheduled. It was at that post-trial motions slash sentencing hearing that the trial judge divulged what had happened. So to take and say that we have to take a sentence back for a new trial, it strikes me as though, in this particular situation, to me, if we carry the logic of what is being argued here to the end, to this logical conclusion, basically, any time a mistake is made like this, a defendant is going to automatically have the option of getting a new trial because a statement is made post-trial. How this affects the fairness of the trial, I don't quite understand. And it's not so much a lack of case law in counsel's brief that I was, if you will, attacking, it's the fact of where is the unfairness? He argues this is all unfair. Explain to me how it's unfair that a statement like this is made. How this affects the fairness of the trial when none of this happened, when the judge was at least, at that point, had had no contact with any of the state witnesses, was purely impartial, listened to the evidence, made his rulings, made his factual findings, and found the defendant guilty based on the evidence. I don't see the unfairness here. And furthermore, the argument that I get from the reply brief seems to be, well, what happened here is the detective here forced the trial judge to have to accuse himself, which deprived him of having the same trial judge who heard the trial through the post-trial motion. Basically, again, in that situation, we come to a no-win situation because if the judge, the trial judge, had not retired, would he necessarily have accused himself? Should he have? I don't know. It does say here that he did recuse himself prior to his retirement. And then Judge Lyons took the case. I'm not, I don't quite, I don't necessarily, I don't know that he necessarily, I don't remember in the record recusing. All I remember is basically when it came back, Judge Lyons had taken the bench and the comment had been made, a firm reference had been made that the trial judge had retired. That was the last two minutes. Thank you. But if we take the argument, if we take the argument that he had the right to have the original trial judge decide his post-trial motion, well then, in this case, if the trial judge hadn't recused himself, we'd be arguing error because he didn't and we're going to argue error because he did. So what's the solution? What's the answer to that? I don't have one because I don't think there is one. Other than, and what it does is, it's convenient because it now paints the picture of, well, maybe defendants should get a new trial. But a new trial based on something that happened after trial that really doesn't affect the fairness of the trial. So again, how do you answer that? Again, I don't know. I don't know because basically it's a no-win situation. It presents a choice that I don't think anybody can really take and come up with a logical, fair answer that's going to take and satisfy the situation, the problem, and be fair to both parties in this situation. I think that if there was any at all unfairness in anything, it would have been in the trial judge having heard the post-trial motion and doing the sentencing at that point. But that problem was alleviated. The trial judge retired. Judge Lyons took over. And if you take away his findings, his findings are much the same as what the people have argued and agreed. So unless there are any questions, I would simply ask the court to affirm defendants' convictions and sentences as important. Does it strike you as odd that if the video was so definitive, the detective even needed her now to make an identification, photo identification? Why couldn't the detective see it for himself on the video? Well, obviously, Your Honor, he must have because he had developed... The record doesn't show what he developed, does it? Well, when I say... Well, the record, in a sense, does show because he had the defendant's photograph in the photo right when he went to Pennell's residence. Okay, let me ask you the question this way. I haven't seen the video, but we'll review it. Can you see the face of the person in the video? Okay. That might be a good enough answer. Well, I would say you can see it. Now, would I be able to take and say who that was? Possibly if I was familiar with him enough, if I had had enough runnings with him, maybe I would have. And if Pennell knew him for nine years, why not just say it was... If I'm not mistaken, again, it's been a while, I think Pennell offered a response, and that simply was that basically they don't talk, they don't take and... What's the word I'm thinking of? I don't want to use the word think. In a situation like that, you handle it differently than going to the police. You just don't talk to the police. I think that's in the record. I think that's what he would testify to. Thank you. You're welcome. Thank you, Your Honor. Thank you, Mr. Kinnearick. Excuse me. Mr. Shire? Thank you, Judge. Justice Wright, let me first clarify. I was absolutely wrong about those dates. I misread my note. Here's the argument I meant to say as I was going through it. That's all right, as long as you clear it up, because that creates some really big problems for a judge and also for a community that thinks they have a judge on the bench who's trying or listening to cases he initiated the prosecution of. So you have stated you were wrong, the facts you recited in open court, and hopefully have not recited to your clients. No, ma'am. Let me clarify. You stand corrected. That's all we need to do. The reason I had that note down about Judge Lyons being the former state's attorney is earlier I had argued that it's the appearance of impropriety that is on our third point on appeal. And then I meant to point out that the new judge who took over is the former state's attorney, and state's attorneys work with the police department. So if you have that impropriety, one, with the comment, followed by someone with a former resume, it compounds the problem. That was the note I meant to raise. I appreciate you correcting the record. Yes, ma'am. The video, in our estimation, Your Honors, when you review the video, does not show the face, and you will hear no sound. And this is why that one-hour, two-hour gap is so important. People run, not necessarily when they hear shots, but from threats as well. So we don't really even know that there was a shot at that time, at that exact time that they're saying. And then you've got that one-hour or two-hour gap that Gates is unaccounted for. At the scene, no complaints that he has shot, no evidence that he has shot, and he leaves a couple hours later, he's in the hospital. And presumably that this is painful enough, and also supported by the photograph that was in the record, that he went and sought medical treatment within a couple of hours. So certainly, had he been shot at that very moment, that there would have been some indication. He would have said something. And so that just isn't clear. The ineffective assistance of counsel, the state indicates, well, they're referring to this as a motion to suppress. And I understand what the case law is, that you can't, you know, whether or not someone files a motion to suppress a strategy. But we're not arguing that. We're saying you can still cross-examine somebody on the photo lineup. For example, how long did it take Parnell to identify Jumar House when he looked at those six photographs? We don't know. He was never asked. There was no cross-examination done on the photo identification. What if it had taken him 20 minutes? What if it took him two hours? Now, is that credible? No, of course not. I mean, is it so much to ask the trial counsel to ask that question? It's one question, how long did it take? And if it was three seconds, or instantaneously he pointed and said, that's Jumar House, how's it going? Okay, great, good evidence. But if it, again, like I said, how long was Detective Moore in his apartment? We don't even know that. We do know that there was some testimony about how first he lied to the detective and then he changed his story. How long did it take him to change his story? We don't know that. It's not so much to ask to do some cross-examination. Counsel says that, well, you know, whether or not lawyers choose to do something or so is strategy. Well, we all get the choice whether we do something or not when we're defending somebody in court. But choosing not to do something, which is what was done here, was, in fact, ineffective. That's what the problem was. The whole case was Parnell, the whole case. I contend when your honors look at the video, you'll also agree the whole case is Parnell. And Parnell's credibility was front and center. And you had to cross-examine him on many issues, most importantly with his identification of Jumar House. Justices have more questions for me. I don't think so. Thank you, Mr. Shire. And thank you both for your argument today. We will take this matter under advisement. In fact, it was a written disposition within a short time. And we'll take a short recess now for advance.